UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

20-109

----------------------------------------------------------X

JEMB REALTY CORP.,  )
  )
    Plaintiff,  )  Docket No:
  )
-against-  )  **ECF CASE**
  )
GREENWICH INSURANCE COMPANY,  )  **COMPLAINT**
  )
  )  <u>**JURY DEMANDED**</u>
  )
    Defendant.  )

----------------------------------------------------------X

  Plaintiff, JEMB REALTY CORP. (hereinafter referred to as "Plaintiff" or "JEMB"), by its attorneys WEG AND MYERS, P.C., as for its Complaint herein alleges as follows:

## INTRODUCTION

  1. Over the last three decades, JEMB Realty has become a three-generation strong, family-run, progressive real estate development, investment and management firm based in New York City.

  2. Long established in the industry for its entrepreneurial strength, JEMB has worked hard to ensure a clear presence in a number of North American cities.

  3. JEMB Realty owns Herald Center, a 250,000 square-foot, 10-story high building that is one of the most densely-travelled, high-impact retail districts in New York City.

  4. Herald Center is home to both the world's largest H & M store and the Manhattan Branch of ASA College, among other tenants, and was the target of a $50 million beautification program by JEMB in 2015.

5. As a result of JEMB's diverse holdings, the Plaintiff specifically sought and procured an environmental policy of insurance with Defendant so as to protect it from environmental hazards.

## NATURE OF THE ACTION

6. This action arises out of Defendant's failure to provide Plaintiff with coverage for losses sustained due to the outbreak of Covid-19 in accordance with the terms of the environmental insurance policy issued to Plaintiff by Defendant.

7. The policy was in full force and effect when the Covid-19 pandemic struck the United States.

8. The effect of this pandemic was to cause physical loss or damage to high volume commercial real estate businesses throughout the United States.

9. Due to the fact that the Plaintiff had purchased an environmental policy of insurance which did not contain any specific exclusions for virus, it expected that, after collecting annual premiums from the Plaintiff, it would be responsive to them during their time of need.

10. Defendant has failed to meet these expectations and has not fulfilled its contractual obligations under the Subject Policy

## JURISDICTION AND PARTIES

11. This action is filed under and pursuant to 28 U.S.C. §1332, in that Plaintiff and Defendant are residents of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interests.

12.     At all times hereinafter mentioned, JEMB was and is a domestic corporation duly organized and existing under and by virtue of the laws of New York, having its principal place of business at 75 Broad Street, 22nd Floor, New York, NY 10004.

13.     At all times hereinafter mentioned, Defendant GREENWICH INSURANCE COMPANY, was and is a foreign corporation organized and existing under and by virtue of the laws of Connecticut, having its principal place of business at 70 Seaview Avenue Seaview House, Stamford, CT 06902.

14.     Pursuant to 28 U.S. Code §1391(b)(2) venue is proper as a substantial part of the events giving rise to this action occurred in the jurisdictional area of the United Stated District Court, Southern District of New York.

15.     An actual controversy of justiciable nature exists between Plaintiff and Defendant involving breach of contract.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

16.     This is an action for breach of insurance contract arising from the failure of Defendant to provide payment to Plaintiff for its losses resulting from the global pandemic commonly referred to as coronavirus beginning on or about March 21, 2020.

17.     On or about May 3, 2017, for good and valuable consideration, Plaintiff procured a policy of insurance from XL bearing policy number PEC0049829 (the "Subject Policy").

18.     The Subject Policy provides coverage for, *inter alia*, Pollution and Remediation.

19.     The Subject Policy bears effective dates from May 3, 2017 to May 3, 2020.

20.     The Subject Policy was in full force and effect as of March 21, 2020.

21. The Subject Policy provides coverage for losses of business interruption and extra expense related thereto, stating in relevant part:

### CONTINGENT BUSINESS INTERRUPTION and EXTRA EXPENSE

> The Company will pay on behalf of the Insured for CONTINGENT BUSINESS INTERRUPTION and EXTRA EXPENSE at a COVERED LOCATION where such CONTINGENT BUSINESS INTERRUPTION and EXTRA EXPENSE commences during the Policy Period, and is resulting from a POLLUTION CONDITION, subject to the Deductible Period and Insured Co-Payment stated below, provided that:
>
> 1. the POLLUTION CONDITION is on, at, under or migrating from a location that is not a COVERED LOCATION and is not otherwise owned, operated, used, maintained, leased, or controlled by the INSURED;
>
> 2. the POLLUTION CONDITION identified in Item 1. above commences during the POLICY PERIOD;
>
> 3. the POLLUTION CONDITION poses an imminent threat that directly impacts any person or property on or at the COVERED LOCATION;
>
> 4. the necessary suspension of the INSURED's normal business operations is required by a government entity; and
>
> 5. the INSURED reports the CONTINGENT BUSINESS INTERRUPTION and EXTRA EXPENSE to the Company, in writing, during the POLICY PERIOD or, where applicable, the EXTENDED REPORTING PERIOD.

22. The policy defines Contingent Business Interruption as:

> the net income, including net rental value, which is net profit, if any, that would have been earned before taxes (or if there is a net loss before taxes, the net loss is deducted), the INSURED would have realized had there been no suspension of its normal business operations at the COVERED LOCATION;

4

23. The policy defines Pollution Condition as:

    1. the discharge, dispersal, release, seepage, migration, or escape of POLLUTANTS into or upon land, or structures thereupon, the atmosphere, or any watercourse or body of water including groundwater;

    2. the presence of any uncontrolled or uncontained POLLUTANTS into land, the atmosphere, or any watercourse or body of water including groundwater; or

    3. the presence of MOLD MATTER on buildings or structures.

24. The policy defines Pollutants as:

    Any solid, liquid, gaseous or thermal pollutant, irritant or contaminant including but not limited to smoke, vapors, odors, soot, fumes, acids, alkalis, toxic chemicals, hazardous substances, waste materials, including medical, infectious and pathological wastes, electromagnetic fields, Legionella, Low-Level radioactive waste and material and mold matter.

25. The policy defines Property damage as:

    (2) The loss of use of such property that has not been physically injured or destroyed;

26. No exclusions contained in the Subject Policy are applicable to the dispute set forth herein.

27. It is beyond cavil that the world is currently experiencing a global pandemic from a disease caused by a novel coronavirus (specifically, SARS-COV-2) and commonly referred to as Covid-19.

28. From at least as early as December 2019, Covid-19 began spreading, first in China and then, because the disease is highly contagious, rapidly around the globe.

29. The first confirmed case of the virus outside China was diagnosed on January

13, 2020 in Bangkok, Thailand with the number of cases exceedingly increasing worldwide.

30. On January 30, 2020, the World Health Organization (WHO) declared the Covid-19 outbreak constituted a public health emergency of international concern.

31. Not only is SARS-COV-2 transmitted via human-to-human, but the WHO and scientific studies have confirmed that the virus can remain infectious on objects or surfaces.

32. Indeed, scientific studies suggest that individuals could get Covid-19 through indirect contact with surfaces or objects used by an infected person, regardless of whether the infected person was symptomatic.

33. By February 25, 2020, the Center for Disease Control ("CDC") warned Americans that the world was on the brink of a global pandemic, effectively dismantling any notion that SARS-COV-2 would not affect American's lives.

34. From that point forward, COVID-19 and its damaging consequences received widespread media attention.

35. The CDC has recommended that individuals stay at home and those who are not sick engage in preventive measures such as constant hand washing and avoiding activities that would bring them into close proximity of people with the virus or surfaces where the virus may reside.

36. Scientific studies suggest that the virus may remain active on surfaces for times varying from hours to days. Following an outbreak on a cruise ship, the CDC confirmed that the virus was still alive on surfaces within cabins on the ship up to seventeen days after the passengers departed the ship.

37. According to a study documented in The New England Journal of Medicine, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to

6

24 hours, on cardboard, and up to three days on plastic and stainless steel.

38. All of these materials are used and found throughout Plaintiff's property.

39. Indeed, scientific studies suggest that individuals could get Covid-19 through indirect contact with surfaces or objects used by an infected person, regardless of whether the infected person was symptomatic.

40. COVID-19 also can spread through airborne transmission.

41. The CDC published a study in July that concluded "droplet transmission was prompted by air-conditioned ventilation" that caused an outbreak among people who dined in the same air-conditioned restaurant.

42. Consequently, while it is possible to identify certain individuals who are suffering from obvious symptoms of the coronavirus, absent significant medical testing, it is impossible to distinguish between infected and non-infected members of the general public.

43. As a result of the Covid-19 pandemic, Plaintiff experienced a loss in revenue as a result of various commercial tenants at the Subject Property not paying the rent that was due to Plaintiff.

44. The loss in revenue was occasioned by the exposure of retail tenants to "pollutants", as defined in the Subject Policy, who were then unable to continue their operations due to exposure to the aforementioned pollutants.

45. In particular, beginning on or about March 20, 2020, Plaintiff's tenants were forced by various municipal and state civil orders to close their doors as a result of their exposure to the aforementioned pollutants.

46. The following relevant orders were issued in New York where the Plaintiff has rental property:

7

> WHEREAS, on March 7, 2020, New York State Governor Andrew Cuomo declared a State disaster emergency for the entire State of New York to address the threat that COVID-19 poses to the health and welfare of New York residents and visitors; and
>
> . . .
>
> WHEREAS, this order is given because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss and damage; and
>
> NOW, THEREFORE, pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law, the New York City Charter and the Administrative Code of the City of New York, and the common law authority to protect the public in the event of an emergency:
>
> . . .
>
> Any large gathering or event for which attendance is anticipated to be in excess of fifty people, or in excess of any number established as the maximum number permitted by an order of the Governor issued pursuant to his powers under section 29-a of the Executive Law, is cancelled or postponed.
>
> Each employer shall reduce the in-person workforce at any work locations by 50% no later than March 20, 2020 at 8:00 p.m., and shall further reduce its in-person workforce to the extent required by any order of the Governor issued pursuant to his powers under section 29-a of the Executive Law.

New York City Emergency Executive Order Nos. 100, 102.

47. As a result of these and similar orders, all issued as a result of the release of "pollutants", directly let to the damages being suffered by the Plaintiffs, damages resulting from the failure of various of the commercial tenants to have paid the rent that was due.

48. Consequently, in order to stem the losses and prevent tenants from breaking their leases, Plaintiff negotiated rent abatements with both H&M and ASA College.

49. Plaintiffs additionally incurred extra expense in an effort to continue

operations on a limited basis.

50. On April 7, 2020 Plaintiff gave Defendant a notice of loss.

51. On or about May 27, 2020, Plaintiff submitted a Proof of Loss claiming a total loss of $3,822,366.18 and requesting policy limits of $3,000,000.00.

52. More than 120 days have passed since the Proof of Loss was submitted

53. Pursuant to New York Insurance Law 11 NYCRR 216.4(b), an insurance company must reply to all pertinent communications within 15 days.

54. Pursuant to New York Insurance Law 11 NYCRR 216.6(c), the Defendants had 15 business days to accept or reject Plaintiff's claim.

55. Notwithstanding the foregoing, the Defendant failed to accept or reject the claim submitted by Plaintiff in a timely manner.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
(Breach of Contract)

56. Plaintiff repeats and re-alleges paragraphs "1" through "55", with the same force and effect as if set forth at length herein.

57. The Subject Policy constituted a binding contract between Plaintiff and Defendant.

58. Plaintiff complied with all of its obligations under the Subject Policy, including through timely notification of a loss and the filing of a Sworn Statement in Partial Proof of Loss.

59. To date, Defendant has failed to compensate Plaintiff for its losses with regard to the Proof of Loss submitted on or about May 27, 2020.

60. Defendant's failure to compensate Plaintiff for its loss constitutes a breach of the Subject Policy.

61. As a result of Defendant's breach of the Subject Policy, Plaintiff has suffered damages of more than $3,000,000.00 together with such additional and subsequent damages as may be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against the Defendant as follows:

(a) On the First Cause of Action, a money judgment against Defendant in the amount of $3,000,000 together with such additional and subsequent damages as may be proven at trial;

(b) Reasonable fees and costs of this action; and

(c) For such other and further relief as to which this Court deems just and proper.

Dated: New York, New York
October 9, 2020

Yours, etc.,

**WEG AND MYERS, P.C.**
*Attorneys for Plaintiff*

By: Joshua L. Mallin (JM0474)
Weg and Myers, P.C.
52 Duane Street, Fl. 2
New York, NY 10007
(212) 227-4210
jmallin@wegandmyers.com